Rockingham
No. 2008-467

EXETER HOSPITAL, INC.

v.

NEW HAMPSHIRE INSURANCE GUARANTY ASSOCIATION

Argued: January 15, 2009
Opinion Issued: February 20, 2009

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*James Q. Shirley* and *Karyl R. Martin* on the brief, and *Mr. Shirley* orally), for the petitioner.

*Nixon Peabody LLP*, of Manchester (*Courtney Q. Brooks & a.* on the brief, and *Mark D. Robins* orally), for the respondent.

HICKS, J. The respondent, New Hampshire Insurance Guaranty Association (NHIGA), appeals an order of the Superior Court (*McHugh*, J.) granting summary judgment in favor of the petitioner, Exeter Hospital, Inc. (Exeter), and denying NHIGA's cross-motion for summary judgment. The trial court declared that Exeter, whose liability insurer is insolvent, has a right to indemnification from NHIGA for $299,999 and is not required under RSA 404-B:12, I (2006) to exhaust a codefendant's insurance coverage. We affirm.

The relevant facts are as follows. Dr. Thomas Wharton is a cardiologist employed by Atlantic Cardiology Associates, P.A. (ACA). ACA agreed to provide Exeter with Dr. Wharton's professional services as the medical director of its cardiac catheterization laboratory. The agreement describes Dr. Wharton's relationship with Exeter as that of an independent contractor.

Dr. Wharton began treating Daniel Smith for exertional angina in 2000. He performed various procedures over the course of Smith's treatment. In May 2001, Dr. Wharton performed a balloon dilation at Exeter in order to cure obstructions within Smith's previously implanted vein grafts. Smith's right ventricle became lacerated during the procedure. Efforts to repair the damage at Portsmouth Hospital were unsuccessful and Smith died days later.

Smith's wife brought a medical malpractice action in March 2003 as administratrix of his estate against Dr. Wharton, ACA and Exeter. Smith's estate alleged that Dr. Wharton unreasonably undertook a high risk procedure, that "Smith was not advised of [the] risks" and that "Exeter Hospital lacked the facilities or staff to treat . . . complications." The writ of summons asserted against each defendant a violation of informed consent (Counts I, V, VIII); negligence and wrongful death (Counts II, IV, VII); and wanton, malicious or oppressive conduct (Counts III, VI, and IX).

Dr. Wharton had professional liability insurance through ACA. Exeter had institutional liability insurance through PHICO Insurance Company. The Commonwealth Court of Pennsylvania ordered PHICO liquidated in February 2002 due to insolvency, triggering certain duties on the part of NHIGA to "step into the shoes" of PHICO. *See* RSA ch. 404-B (2006).

NHIGA informed Exeter by letter that "there is potentially one covered claim against Exeter under [its policy with PHICO] for the alleged bodily injuries of Mr. Smith." NHIGA, however, reminded Exeter that, by statute, "the maximum potential recovery from NHIGA [on this claim] would be $299,999 minus the $50 statutory deductible." It also reminded Exeter of its duty to exhaust "solvent insurance" coverage for vicarious liability claims.

Dr. Wharton and Exeter eventually reached a settlement agreement with Smith's estate. Dr. Wharton, who had sufficient insurance to cover the entire amount, contributed part of the settlement. Exeter paid the balance, which exceeded the $299,999 NHIGA maximum coverage. NHIGA refused to reimburse any part of Exeter's settlement contribution, citing Exeter's statutory duty to exhaust Dr. Wharton's insurance coverage. Exeter petitioned for declaratory judgment seeking indemnification. Both parties moved for summary judgment.

The trial court ruled in favor of Exeter. It first concluded that Dr. Wharton was an independent contractor. It found no indication that Exeter was "vicariously liable" for his negligence under any of the three exceptions to the rule that an employer is generally not liable for the negligence of an independent contractor. *See Lawyers Title Ins. Corp. v. Groff*, 148 N.H. 333, 336 (2002) (listing exceptions as "(1) negligence of the employer in selecting, instructing or supervising the contractor; (2) employment for work that is inherently dangerous; and (3) instances in which the employer is under a non-delegable duty").

The trial court further noted that, although the claims against Exeter and Dr. Wharton overlapped in some respects, Exeter "alone is alleged to be negligent for its operation of the hospital." Reasoning that the dispute was more closely aligned with our decision in *N.H. Ins. Guaranty Assoc. v. Elliot Hosp.*, 154 N.H. 571 (2006), than *OB/GYN Assocs. of S.N.H. v. N.H. Ins. Guaranty Assoc.*, 154 N.H. 553 (2006), the trial court concluded that

Exeter had no duty to exhaust Dr. Wharton's insurance before seeking reimbursement from NHIGA and that "NHIGA . . . is obligated to reimburse Exeter Hospital for $299,999 of the settlement agreement payment."

On appeal, NHIGA advances four reasons why Exeter is subject to the exhaustion requirement within RSA 404-B:12, I: (1) the Smith estate alleged the same claim against Exeter and Dr. Wharton; (2) there was insufficient evidence to conclude as a matter of law that Dr. Wharton was an independent contractor; (3) the Smith estate could nevertheless invoke the doctrine of apparent authority to establish vicarious liability; and (4) the Smith estate could have attributed Dr. Wharton's liability to Exeter because Exeter owed to Smith a non-delegable duty.

"While we conclude that the trial court reached the correct result, we affirm on the basis of slightly different reasoning." *Mathena v. Granite State Ins. Co.*, 129 N.H. 249, 251 (1987). In reviewing the superior court's summary judgment rulings, we consider the evidence in the light most favorable to each party in its capacity as the non-moving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. *Elliot*, 154 N.H. at 574. The instant dispute requires interpretation of the New Hampshire Insurance Guaranty Association Act (Guaranty Act), RSA ch. 404-B. The interpretation of a statute is to be decided ultimately by this court. *N.H. Ins. Guaranty Assoc. v. Pitco Frialator*, 142 N.H. 573, 576 (1998). We interpret the Guaranty Act by focusing first upon its language, then by considering the context of the overall statutory scheme, and, finally, by looking for guidance to other states' interpretations of similar statutes. *OB/GYN*, 154 N.H. at 556.

The Guaranty Act is intended

> to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

RSA 404-B:2. RSA chapter 404-B applies broadly to many forms of direct liability insurance, *see* RSA 404-B:3, and "shall be liberally construed to effect [its] purpose," RSA 404-B:4.

NHIGA is "a nonprofit unincorporated legal entity," RSA 404-B:6, funded through insurer assessments, RSA 404-B:8, I(c). It is "obligated to the extent of the covered claims," RSA 404-B:8, I(a), and "deemed the insurer to the extent of its obligation on the covered claims," RSA 404-B:8,

I(b). *See Benson v. N.H. Ins. Guaranty Assoc.*, 151 N.H. 590, 598-99 (2004) (discussing statutory framework of NHIGA).

We normally conduct a two-part test "in order to determine the payment obligations of NHIGA in cases involving third-party claims against the insured which have been paid by the insured." *Pitco Frialator*, 142 N.H. at 578. "We first examine the underlying action brought against the insured and determine the existence and extent of NHIGA's obligation to defend and indemnify in that action." *Id.* NHIGA does not contend that it had no duty to defend Exeter. Thus, our inquiry is limited to determining "the existence and extent of NHIGA's payment obligation with respect to the insured's reimbursement claim against NHIGA." *Id.* at 578-79.

The section of the Guaranty Act at issue is the "Nonduplication of Recovery" provision of RSA 404-B:12, which provides, in relevant part:

> Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim . . . shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

RSA 404-B:12, I. "[This] provision prevents claimants from double recovery or windfall by virtue of an insurance company's insolvency." *OB/GYN*, 154 N.H. at 558 (quotation omitted).

By its terms, the Guaranty Act requires exhaustion for each "claim against [a solvent] insurer" that also constitutes "a covered claim." RSA 404-B:12, I; *see Elliot*, 154 N.H. at 575 (discussing the two statutory prerequisites triggering exhaustion requirement).

"Covered claim" is defined within the Guaranty Act as "a net unpaid claim, in excess of $50 . . . which arises out of and is within coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer . . . is declared insolvent." RSA 404-B:5, IV. NHIGA does not dispute that the relevant claims in the underlying action are covered claims. Therefore, we proceed to examine the factual allegations and legal assertions in the Smith estate action to determine which covered claims, if any, are also "claim[s] against an insurer." RSA 404-B:12, I; *see Elliot*, 154 N.H. at 577; *OB/GYN*, 154 N.H. at 559.

"[C]laim against an insurer," RSA 404-B:12, I, is not specifically defined within the Guaranty Act. We have construed the term to contemplate "both an insured's claim against a solvent insurer and the third-party

claim against the insured that gives rise to the insured's claim against its solvent insurer." *OB/GYN*, 154 N.H. at 558; *see Pitco Frialator*, 142 N.H. at 578. Because the litigants dispute only Count VII for negligence and wrongful death, we limit our discussion to this claim. *See OB/GYN*, 154 N.H. at 558. To the extent Count VII comprises the "same claim[]," *Elliot*, 154 N.H. at 577; *see OB/GYN*, 154 N.H. at 559, asserted against Dr. Wharton, it constitutes a "claim against an insurer," RSA 404-B:12, I, subject to exhaustion of his insurance.

■ Count VII can be read to assert vicarious liability on the basis of Dr. Wharton's agency relationship with Exeter. Assuming without deciding that such an agency relationship existed, any vicarious liability is clearly a "claim against an insurer," RSA 404-B:12, I, because it duplicates the assertions of fault against Dr. Wharton. *OB/GYN*, 154 N.H. at 559 (Where "the only theory of liability . . . asserted against [the insured codefendant] is vicarious liability . . . [and] no acts or omissions by [the insured codefendant are] alleged, nor . . . any theory of direct liability[,] . . . [t]he claims . . . are the same because they are based upon identical factual allegations and legal assertions.").

Count VII, however, advances other theories of liability unique to Exeter. Paragraph two of the writ of summons alleges that Dr. Wharton "acted under the supervision and direction of and as an employee, agent and/or servant of . . . Exeter." After reiterating this allegation in paragraph thirty eight, paragraph forty broadly avers that Exeter "had a duty to exercise the degree of care, knowledge and skill of the average hospital . . . [and] breached its duty causing . . . [d]amages." The plaintiff's pretrial statement elaborated that "[i]t was a departure from good and accepted practice for Exeter . . . to permit [the procedure performed by Dr. Wharton] . . . in non-emergent patients . . . without on-site cardiothoracic surgical backup." In addition to alleging a variety of direct negligence theories against Exeter based upon permitting Smith's surgery to take place at its facilities, the writ can also fairly be read to assert a claim against Exeter for negligent supervision of Dr. Wharton. *Cf. Robbins v. Seekamp*, 122 N.H. 318, 322 (1982) (plaintiff's failure to use words "products liability" in pleadings did not preclude claim for negligent design and manufacture where language tracked statute supplying cause of action).

■ The basis for a claim of negligent employment or supervision brought against an employer where the employee harms a third party is not the vicarious liability of the doctrine of *respondeat superior*, but a separate theory of employer liability. Thus, claims for negligent hiring, training and supervision encompass direct liability as a result of the misconduct of the employee.

14 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, LOCAL GOVERNMENT LAW § 1041, at 297 (1995); *see Cutter v. Town of Farmington*, 126 N.H. 836, 840 (1985).

Because Count VII alleges one or several bases for direct fault uniquely attributed to Exeter, it does not constitute the same claim asserted against Dr. Wharton and, accordingly, is not a "claim against an insurer," RSA 404-B:12, I. *See Elliot*, 154 N.H. at 577 (holding that two claims for medical negligence, though overlapping, were not the same claim where both hospitals were charged with negligence during and after baby's delivery but only one hospital was charged with negligent pre-natal care). NHIGA is therefore "obligated to the extent of the covered claim[]," RSA 404-B:8, I(a), as Exeter's "deemed . . . insurer," RSA 404-B:8, I(b), in "that amount of each covered claim which is less than $300,000," RSA 404-B:8, I(a). Indeed, NHIGA's argument that Exeter owed to Smith a non-delegable duty would, if anything, support this conclusion.

We do not reach NHIGA's remaining arguments, concerning the trial court's finding that Dr. Wharton was an independent contractor, because an employer is subject to direct liability for the negligent selection, instruction or supervision of both agents *and* independent contractors. *See Groff*, 148 N.H. at 336; *Herman v. Monadnock PR-24 Training Council*, 147 N.H. 754, 758-59 (2002).

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.